J-A17039-18

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| v. | : | |
| WILLIAM LEE ETTISON | : | |
| Appellant | : | No. 1063 WDA 2017 |

Appeal from the Order Entered June 22, 2017
in the Court of Common Pleas of Erie County,
Criminal Division at No(s): CP-25-CR-0000072-1995,
CP-25-CR-0000112-2016, CP-25-CR-0000668-1996,
CP-25-CR-0000687-1995, CP-25-CR-0000865-2010,
CP-25-CR-0000993-2016, CP-25-CR-0001588-1993,
CP-25-CR-0001707-2010, CP-25-CR-0001709-2010,
CP-25-MD-0000024-2016, CP-25-MD-0000113-2016,
CP-25-MD-0000712-2015, CP-25-SA-0000098-2006,
CP-25-SA-0000098-2010, CP-25-SA-0000133-2009

BEFORE: OTT, J., KUNSELMAN, J., and MUSMANNO, J.

MEMORANDUM BY MUSMANNO, J.: FILED SEPTEMBER 20, 2018

William Lee Ettison ("Ettison") appeals from the Order denying his Petition to Suspend Payment of Costs. We affirm.

In its Opinion, the trial court described the relevant underlying history as follows:

[Ettison] has been convicted of various crimes in every decade since the 1990s. He has been sentenced to pay restitution, fines and costs since 1991. His payment history consists of sporadic, minimal payments. [Ettison] has been in chronic arrears; he still owes restitution, fines and costs from the 1990s.

The procedural genesis of this appeal is [Ettison's] Petition to Suspend Payment of Costs[,] filed on May 19, 2017, seeking to suspend his obligation to pay restitution, fines and costs based on

his alleged inability to pay. An evidentiary hearing was held on June 22, 2017. The result was a determination [that Ettison] had the ability to pay $50 per month toward the $12,874.28 he owed to victims, etc.[,] on numerous dockets. This appeal followed.

Trial Court Opinion, 9/29/11, at 1-2.[1] The trial court's Opinion also details

Ettison's financial obligations, which were imposed at nineteen separate

docket numbers. See id. at 4-6.

In this appeal, Ettison presents the following issues for our review:

1. Did the trial court abuse its discretion by not temporarily suspending [] Ettison's obligation to make payment on his fines, costs, and restitution[,] in light of the uncontested evidence showing that he is indigent, disabled, and unable to work?

2. Did the trial court abuse its discretion by placing [] Ettison on a $50 per month payment plan[,] when the uncontested evidence showed that he is indigent, disabled, unable to work and lacks any financial resources that would permit him to make those payments?

3. Did the trial court further abuse its discretion by placing [] Ettison on that $50 per month payment plan and requiring the first payment one week after the entry of the order, without giving him time to search for work?

Brief for Appellant at 4.

Initially, we observe that in his Rule 1925(b) Concise Statement, Ettison

preserved the following two claims for our review:

1. The [trial court] erred by not temporarily suspending [] Ettison's obligation to make payments in light of his financial circumstances and the evidence presented, which showed that [] Ettison had no present ability to pay, in violation of his rights

_____

[1] We note that Ettison properly filed a Concise Statement of matters complained of on appeal, in accordance with Pa.R.A.P. 1925(b).

to Due Process and Equal Protection outlines in, inter alia, Commonwealth ex rel. Parrish v. Cliff, 304 A.2d 158 (Pa. 1973), Bearden v. Georgia, 461 U.S. 660 (1983) and Pa.R.Crim.P. 706; and

2. The [trial court] erred by placing [] Ettison on an unreasonable payment plan in light of his financial circumstances and the evidence presented, which showed that [] Ettison has no present ability to pay, in violation of his rights to Due Process and Equal Protection outlined in, inter alia, Commonwealth ex rel. Parrish v. Cliff, 304 A.2d 158 (Pa. 1973), Bearden v. Georgia, 461 U.S. 660 (1983)[,] and Pa.R.Crim.P. 706.

Concise Statement, 8/7/17. To the extent that Ettison raises claims not included in the above-stated issues, we deem them waived.[2] See Pa.R.A.P. 1925(b)(3)(iv) (providing that the failure to include an issue in a Rule 1925(b) statement results in waiver).

We will address Ettison's claims together, as they are all related to whether Ettison was entitled to the suspension or waiver of his obligation to pay fines, costs and restitution installment payments (hereinafter Ettison's "financial obligations") under Pa.R.Crim.P. 706(D). Ettison first challenges the trial court's rejection of his request to suspend or waive his financial obligations. Brief for Appellant at 19. Ettison argues that at the hearing, he presented uncontested evidence that he could not afford to comply with his

_____

[2] For example, Ettison asks this Court whether the standards applicable to a determination of in forma pauperis status and the appointment of counsel should be applied to determine whether a criminal defendant may gain relief under Pa.R.Crim.P. 706. Brief for Appellant at 36. This argument was not raised in Ettison's Rule 1925(b) Concise Statement and, accordingly, is waived. See Pa.R.A.P. 1925(b)(3)(iv).

payment plan. Id. According to Ettison, the uncontested evidence showed that he (1) was in a car accident that left him "fully disabled"; (2) lost his job because he was unable to work as a result of the accident, and the pain it caused him; (3) sleeps at his siblings' houses because otherwise, he would be homeless; and (4) has no assets of any value. Id. at 19-20. In support, Ettison asserts that a different common pleas court judge temporarily suspended his child support payments, in light of his indigence. Id. at 20. Ettison argues that "the only burden on [him] was to show [that] he could not pay $85 per month, a burden that he met." Id. at 22. Ettison questions the trial court's determination that he failed to meet his burden, while simultaneously reducing Ettison's monthly payment from $85 to $50. Id. at 20-21.

Ettison contends that he was not given the opportunity to challenge his ability to afford the new payment amount, as it was never proposed to him. Id. at 21. Ettison directs our attention to case law holding that a defendant's entitlement to public assistance invites a "presumption of indigence." Id. at 23. According to Ettison, the Commonwealth did not present evidence to rebut this presumption. Id. at 25. Ettison also disputes the trial court's findings regarding his indigence, its consideration of "irrelevant" evidence, and its credibility determinations. Id. at 25-32.

Ettison asserts that the trial court's findings regarding his ability to pay are contradicted by the evidence of record, and relies upon the testimony of

his chiropractor, Dr. John Lupo, as being "conclusive." Id. at 27-28. In particular, Ettison directs our attention to testimony regarding Ettison's inability to perform light duty work, arguing that the trial court drew an unsubstantiated conclusion that Ettison is not fully disabled. Id. at 34. Ettison claims that there was no evidence that he can pay the newly imposed amount of $50 per month. Id. at 33-35.

Ettison additionally asserts that the imposition of an impossible payment plan could lead to a deprivation of his liberty interest. Id. at 41. Ettison argues that, "[e]ven without actually holding [a] defendant in contempt, there is the real possibility of an erroneous deprivation of [an] individual's liberty interest[,] if the trial court issues a bench warrant simply for [the] failure to pay." Id. at 41. Ettison asserts that "the Pennsylvania Supreme Court could not have intended[,] when it ruled in Parrish and enacted Rule 706[,] that trial courts could place defendants on payment plans[,] when the uncontested evidence showed that they could not afford to pay those amounts." Id. at 42-43. Ettison further posits that if the trial court found him capable of light work, "the reasonable course of action would have been to set [] Ettison on a payment plan that started in several months, so that he would have time to look for work." Id. at 44.

In its Opinion, the trial court addressed Ettison's claims and concluded that they lack merit. See Trial Court Opinion, 9/29/11, at 7-15. The trial court's findings are supported in the record and its legal conclusions are

sound. We therefore affirm on the basis of the trial court's Opinion with regard to Ettison's claims, see id., with the following addendum.

Issues pertaining to a defendant's inability to pay court costs, fines and restitution are governed by Rule 706 of the Rules of Criminal Procedure, which provides as follows:

(A) A court shall not commit the defendant to prison for failure to pay a fine or costs unless it appears after hearing that the defendant is financially able to pay the fine or costs.

(B) When the court determines, after hearing, that the defendant is without the financial means to pay the fine or costs immediately or in a single remittance, the court may provide for payment of the fines or costs in such installments and over such period of time as it deems to be just and practicable, taking into account the financial resources of the defendant and the nature of the burden its payments will impose, as set forth in paragraph (D) below.

(C) The court, in determining the amount and method of payment of a fine or costs shall, insofar as is just and practicable, consider the burden upon the defendant by reason of the defendant's financial means, including the defendant's ability to make restitution or reparations.

(D) In cases in which the court has ordered payment of a fine or costs in installments, the defendant may request a rehearing on the payment schedule when the defendant is in default of a payment or when the defendant advises the court that such default is imminent. At such hearing, the burden shall be on the defendant to prove that his or her financial condition has deteriorated to the extent that the defendant is without the means to meet the payment schedule. Thereupon the court may extend or accelerate the payment schedule or leave it unaltered, as the court finds to be just and practicable under the circumstances of record. When there has been default and the court finds the defendant is not indigent, the court may impose imprisonment as provided by law for nonpayment.

Comment:

See generally Commonwealth ex rel. [Parrish] v. Cliff, 451 Pa. 427, 304 A.2d 158 (1973).

Under this rule, when a defendant fails to pay the fine and costs, the common pleas court judge may issue a bench warrant for the collection of the fine and costs. When a "failure to pay" bench warrant is issued, the bench warrant must be executed by a police officer following the procedures set forth in Rule 431(C)(1)(c) and (C)(2), or, if the defendant is unable to pay, the police officer must proceed as provided in Rule 150 (Bench Warrants).

Nothing in this rule is intended to abridge any rights the Commonwealth may have in a civil proceeding to collect a fine or costs.

Pa.R.Crim.P. 706. Rule 431(C) provides, in relevant part, as follows:

(1) When a bench warrant is executed, the police officer shall either

...

(c) accept from the defendant the amount of restitution, fine and costs due as specified in the warrant if the warrant is for collection of restitution, fines, and costs after a ... conviction; or

(d) if the defendant is unable to pay, promptly take the defendant for a hearing on the bench warrant as provided in paragraph (C)(3).

...

(3) When the defendant does not pay the restitution, fine and costs, or collateral, the defendant promptly shall be taken before the proper issuing authority when available pursuant to Rule 117 for a bench warrant hearing. The bench warrant hearing may be conducted using two-way simultaneous audio-visual communication.

Pa.R.Crim.P. 431(C)(1), (3).

"When construing a Rule of Criminal Procedure, courts utilize the Statutory Construction Act when possible." Commonwealth v. Sepulveda, 144 A.3d 1270, 1270 n.18 (Pa. 2016) (citing Pa.R.Crim.P. 101(c)). Under the Statutory Construction Act, "[w]hen the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit." 1 Pa.C.S.A. § 1921(a). "This Court is without authority to insert a word into a statutory provision where the legislature has failed to supply it." Key Sav. and Loan Ass'n v. Louis John, Inc., 549 A.2d 988, 991 (Pa. Super. 1988) (citing Worley v. Augustine, 456 A.2d 558, 561 (Pa. Super. 1983)).

As set forth above, Rule 706(D) provides a criminal defendant with the opportunity to request a hearing, at which "the burden shall be on the defendant to prove that his or her financial condition has deteriorated to the extent that the defendant is without the means to meet the payment schedule[.]" Pa.R.Crim.P. 706(D). When a defendant meets that burden, subsection (D) authorizes the court to "extend or accelerate the payment schedule or leave it unaltered[.]" Pa.R.Crim.P. 706(D) (emphasis added). Rule 706(D) provides no entitlement to having fines and costs suspended or waived, even after indigent status is recognized. Thus, Ettison asks this Court to insert the words "waive" or "suspend" into Rule 706(D), where the legislature has failed to do so. This we cannot do. See Key Sav. and Loan Ass'n, 549 A.2d at 991. As the waiver or suspension of Ettison's financial

obligations is not authorized under Rule 706(D), Ettison's claims challenging the trial court's failure to suspend or waive his payments lack merit.[3]

We also note that, although Ettison questions the protection of his liberty interests should he be unable to pay the new monthly installment amount,[4] procedural safeguards remain in place. The United States Supreme Court has made it clear that "a court may not constitutionally imprison someone for nonpayment of court costs and fines alone. Instead, it must be proved that the person 'has willfully refused to pay the fine or restitution when he has the means to pay ....'" Commonwealth v. Mauk, 185 A.3d 406, 411 (Pa. Super. 2018) (quoting Bearden, 461 U.S. at 668). "Process is due in all costs-and-fines proceedings." Mauk, 185 A.3d at 411.

In the future, should Ettison fail to meet the new payment schedule, the trial court must conduct a hearing and render findings of fact as to Ettison's financial resources. See 42 Pa.C.S.A. § 9730 (stating that imprisonment for nonpayment must be pursuant to law); id. § 9772 (explaining that imprisonment for nonpayment must occur after a hearing and a determination that the defendant's failure to pay was not excusable); Pa.R.Crim.P. 431(C)(1)(d), (C)(3) (if a defendant is unable to pay, requiring a police officer

_____

[3] Notwithstanding the trial court's failure to credit Ettison's evidence regarding his inability to pay, the court nevertheless reduced Ettison's monthly financial obligations.

[4] See Brief for Appellant at 41.

serving a "failure to pay" bench warrant to "promptly take the defendant for a hearing on the bench warrant" before the proper issuing authority); see also Commonwealth v. Diaz, 2018 Pa. Super. LEXIS 693 *34 (Pa. Super. filed June 21, 2018) (concluding that, "[b]y imprisoning [the defendant] without the required findings of fact of his financial resources, the court failed to apply the law properly.").[5]  Thus, Ettison's concern over a future due process violation, and the protection of his liberty interests, is not only premature, it is unwarranted.[6]

Consequently, for the additional reasons stated above, we discern no abuse of discretion by the trial court in reducing Ettison's monthly payment obligation, but declining to suspend or waive Ettison's financial obligations.

Order affirmed.

_____

[5] Ettison argues in his Supplemental Brief that in Diaz, this Court held that the trial court improperly imposed a $100 per month payment plan on two defendants, because it had failed to make the required findings regarding the defendants' financial resources.  Supplemental Brief at 1.  However, this Court held that imprisoning the defendants, without determining their financial resources, constituted error.  See Diaz, supra.

[6] In the event that Ettison is unable to meet the new monthly obligation, Rule 706 permits him to seek a further reduction in his payment amounts.  See Pa.R.Crim.P. 706(D).

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 9/20/2018

COMMONWEALTH OF PENNSYLVANIA : IN THE COURT OF COMMON PLEAS
: OF ERIE COUNTY, PENNSYLVANIA
v. : CRIMINAL DIVISION
:
:
: NOS. 1588 AND 2682-1993; 72; 687,
: 668; 1223 OF 1995; 2951-2005;
: 865; 1707; 1709-2010; 112; 993
: OF 2016; MD 2078; 2528 OF 1991;
: MD 712-2015; MD 24; 113 OF 2016;
WILLIAM ETTISON : SA 98-2006; SA 133-2009; SA 98 2010

## RULE 1925(a) OPINION

The presenting matter is the denial of Appellant's Petition to Suspend Payment of Costs by Order dated June 22, 2017. Appellant filed a Notice of Appeal on July 19, 2017 and a Concise Statement of Matters Complained of on Appeal on August 7, 2017.

Appellant cloaks his appeal in constitutional cloth by alleging a denial of due process and his right to equal protection. However, there is no constitutional basis for this appeal because Appellant was given due process and equal protection when he received an evidentiary hearing on his Petition to Suspend Payment of Costs. On the merits, there was not a credible basis to grant the relief Appellant requested.

## BACKGROUND

It is important to identify what this case is not about versus the manner in which it is portrayed in this appeal. Appellant has been convicted of various crimes in every decade since the 1990s. He has been sentenced to pay restitution, fines and costs since 1991. His payment history consists of sporadic, minimal payments. Appellant has been in chronic arrears; he still owes restitution, fines and costs from the 1990s.

The procedural genesis of this appeal is Appellant's Petition to Suspend Payment of Costs filed on May 19, 2017, seeking to suspend his obligation to pay restitution, fines and costs

1

based on his alleged inability to pay. An evidentiary hearing was held on June 22, 2017. The result was a determination Appellant had the ability to pay $50 per month toward the $12,874.28 he owed to victims, etc. on numerous dockets. This appeal followed.

## APPELLANT'S CONSTITUTIONAL RIGHTS

Appellant's constitutional logic is contorted. Appellant claims his right to due process and equal protection were violated when it was found he had the ability to pay $50 monthly toward restitution, fines and costs owed since 1991. However, Appellant's due process and equal protection rights were fully honored when he was given an evidentiary hearing on his Petition to Suspend Payment.

Appellant's reliance on *Bearden v. Georgia*, 461 U.S. 660 (1983) is misplaced. In *Bearden*, the issue was "whether the Fourteenth Amendment prohibits a State from revoking an indigent defendant's probation for failure to pay a fine and restitution." *Bearden, p. 661*. The United States Supreme Court ultimately held "...the trial court erred in automatically revoking probation because petitioner could not pay his fine, without determining that petitioner had not made sufficient bona fide efforts to pay or that adequate alternative forms of punishment did not exist." *Id., p. 662*.

*Bearden* is premised on the failure of the government to afford a defendant a hearing on the ability to pay prior to revoking probation. This issue does not exist herein because the government was not automatically revoking Appellant's probation for failure to pay court-ordered restitution, fines and costs. In fact, the government was not seeking any sanction against Appellant. By contrast, Appellant is the moving party who seeks relief from his longtime obligations. Because Appellant was given a full evidentiary hearing on his Petition to Suspend, *Bearden* defeats Appellant's constitutional argument.

Appellant's reliance on *Commonwealth ex rel. Parrish v. Cliff*, 304 A.2d 158 (Pa. 1973) is also unjustified. In *Parrish*, it was the policy of the Lancaster County Court of Common Pleas to incarcerate a defendant who failed to pay toward fines and costs. Four inmates of the county prison filed a Writ of Habeas Corpus. Ultimately the Pennsylvania Supreme Court held a defendant could not be incarcerated for a failure to pay without first providing the defendant a hearing to determine whether indigence was the cause of the non-payment.

The *Parrish* facts are not applicable to Appellant's case. He was not incarcerated without a hearing pursuant to a countywide policy. To the contrary Appellant's liberty interests were not at issue as it was simply a hearing on Appellant's Petition to Suspend his obligation to pay. The result of Appellant's hearing was not his incarceration, instead it was a minimal payment plan based on his ability to pay.

The constitutional concerns of the *Bearden* and *Parrish* courts were addressed in Pennsylvania by Pa. R. Crim. P. 706, which, in relevant part, provides:

> In cases in which the court has ordered payment of a fine or costs in installments, the defendant may request a rehearing on the payment schedule when the defendant is in default of a payment or when the defendant advises the court that such default is imminent. At such hearing, the burden shall be on the defendant to prove that his or her financial condition has deteriorated to the extent that the defendant is without the means to meet the payment schedule. Thereupon the court may extend or accelerate the payment schedule or leave it unaltered, as the court finds to be just and practicable under the circumstances of record. When there has been default and the court finds the defendant is not indigent, the court may impose imprisonment as provided by law for nonpayment.

Pa. R. Crim. P. 706(D).

Consistent with Pa. R. Crim. P. 706, an evidentiary hearing was held on Appellant's Petition to Suspend Payment of Costs. Appellant was given due process and has no equal protection claim. That Appellant did not satisfy his burden of proving a basis to suspend his payments does not give rise to a constitutional violation.

3

## APPELLANT'S FINANCIAL RESPONSIBILITIES

Appellant's lengthy criminal history needs reviewed to establish the basis for his legal responsibilities and payment history. The following is a chronological listing of the actual open cases in which Appellant would have been entitled to the relief he sought. *See Court Exhibit A, attached hereto and incorporated herein.*

At Docket Number 2078 of 1991, Appellant was convicted of simple assault, 18 Pa. C.S.A. § 2701(a). He was ordered to pay restitution and costs in the amount of $4,020.91. As of the time of the June 22, 2017 evidentiary hearing, Appellant owed a total balance of $2,738.56, which included a restitution balance of $2,327.06 to his assault victim. The date of the assault was August 26, 1991.

At Docket Number 2528 of 1991, Appellant was convicted of criminal conspiracy, burglary, theft by unlawful taking, and receiving stolen property.[1] He was ordered to pay restitution and costs in the amount of $444.00. As of the June 22, 2017 hearing, he still owed $412.50.

At Docket Number 1588 of 1993, Appellant pled guilty to an amended charge of disorderly conduct, a violation of rules regarding conduct on Commonwealth property, and depositing waste on a highway.[2] His assessments totaled $607.00. Appellant still owes $535.50.

At Docket Number 2682 of 1993, Appellant was charged with simple assault, 18 Pa. C.S.A. § 2701(a). He pled guilty to the charge as harassment, 18 Pa. C.S.A. § 2709(a). He was ordered to pay restitution and costs in the amount of $173.00. He does not owe anything at this docket.

---

[1] 18 Pa. C.S.A. § 903(a)(1); 18 Pa. C.S.A. § 3502(a); 18 Pa. C.S.A. § 3921(a); and 18 Pa. C.S.A. § 3925(a), respectively.

[2] 18 Pa. C.S.A. § 5503(a)(1); 18 Pa. C.S.A. § 7506(b); and 75 Pa. C.S.A. § 3709(a), respectively.

4

At Docket Number 72 of 1995, Appellant pled guilty to simple assault, 18 Pa. C.S.A. § 2701(a). He was ordered to pay costs that totaled $418.80. He still owes $387.30.

At Docket Number 687 of 1995, Appellant pled guilty to criminal mischief, theft by unlawful taking, theft by receiving stolen property, and criminal conspiracy.[3] He was ordered to pay restitution and costs in the amount of $285.95. He owes $254.45.

At Docket Number 1223 of 1995, Appellant was convicted of simple assault, 18 Pa. C.S.A. § 2701(a). He was ordered to pay restitution and costs in the amount of $472.75. He owes $130.56.

At Docket Number 668 of 1996, Appellant was convicted of terroristic threats, 18 Pa. C.S.A. § 2706, and disorderly conduct, 18 Pa. C.S.A. § 5503(a)(1). He was ordered to pay costs in the amount of $810.40. He owes $778.90.

At Docket Number 98 of 2006, Appellant was found guilty after a summary appeal hearing of operating a vehicle while registration was suspended, 75 Pa. C.S.A. § 1371(a). He was ordered to pay costs that totaled $561.50. He owes $471.50.

At Docket Number 133 of 2009, Appellant was found guilty after a summary appeal hearing of careless driving, 75 Pa. C.S.A. § 3714(a). He was ordered to pay fines and costs totaling $409.50. He owes $399.50.

At Docket Number 98 of 2010, Appellant was found guilty after a summary appeal hearing of careless driving, illegal racing, and improper license for the vehicle class. He was ordered to pay fines and costs totaling $583.00. He owes $519.50.[4]

---

[3] 18 Pa. C.S.A. § 3304(a); 18 Pa. C.S.A. § 3921(a); 18 Pa. C.S.A. § 3925(a); and 18 Pa. C.S.A. § 903(a)(1), respectively.

[4] 75 Pa. C.S.A. § 3714(a); 75 Pa. C.S.A. § 3367(a); 75 Pa. C.S.A. § 1504(c)

At Docket Number 865 of 2010, Appellant was convicted of fleeing or attempting to elude a police officer, reckless driving, disobeying duties at a stop sign, forged title registration, possession of controlled substance, possession of marijuana, and possession of drug paraphernalia.[5] He was ordered to pay fines and costs totaling $1,983.25. He owes $1,932.47.

At Docket Number 1707 of 2010, Appellant pled guilty to disorderly conduct, 18 Pa. C.S.A. §5503(a)(4), and reckless driving, 75 Pa. C.S.A. §3736. His fines and costs are $688.50. He owes $628.50.

At Docket Number 1709 of 2010, Appellant pled guilty to public drunkenness, 18 Pa. C.S.A. §5505. His fines and costs were $539.75. He owes $456.25.

At Docket Number 712 of 2015, Appellant was convicted of violation of a PFA order, 23 Pa. C.S.A. §6113. His assessments totaled $682.15. He has not paid anything in this case.

At Docket Number 24 of 2016, Appellant was convicted of violation of a PFA order, 23 Pa. C.S.A. §6113. His assessments are $466.00, none of which has been paid.

At Docket Number 112 of 2016, Appellant was convicted of harassment, 18 Pa. C.S.A. §2709(a)(1). He was ordered to pay costs in the amount of $515.14. He owes $455.14

At Docket Number 113 of 2016, Appellant was convicted of violation of a PFA order, 23 Pa. C.S.A. §6113. He was ordered to pay $466.00, all of which remains unpaid.

At Docket Number 993 of 2016, Appellant pled guilty to an amended count of disorderly conduct, 18 Pa. C.S.A. §5503(a)(4), and all other charges were *nolle prossed*. He owes $1,159.50 (after receiving an adjustment of $400).

As of the date of the June 22, 2017 hearing, Appellant's aggregate arrears dating back to his 1991 docket totaled $12,874.28.

---

[5] 75 Pa. C.S.A. § 3733(a); 75 Pa. C.S.A. § 3736(a); 75 Pa. C.S.A. § 3323(b); 75 Pa. C.S.A. § 7122(1); 35 Pa. C.S.A. § 780-113(a)(16); 35 Pa. C.S.A. § 780-113(a)(31); and 35 Pa. C.S.A. § 780-113(a)(32), respectively.

Appellant does not contest the validity or calculation of his arrears.

Since 1991, Appellant's payment history has been inconsistent and minimal. Among Appellant's 19 cases, only one case, Docket Number 2682 of 1983, has been paid in full (total was $173). In three cases, Appellant has paid nothing.[6] The remaining 15 active cases show a token payment history since 1991. The picture presented is that Appellant continually violates the law without any intention of paying the financial consequences.

Appellant was 46 years old at the June 22, 2017 hearing. The order on appeal requires him to pay $50 monthly on his arrears of $12,874.28. Assuming Appellant pays $50 monthly, it would take him nearly 21.5 years to satisfy his legal responsibilities. Hence Appellant cannot in good faith contend the Order is unreasonable.

## APPELLANT'S REQUEST TO SUSPEND

Appellant bore the burden of proof in support of his Petition to Suspend. *Pa.R.Crim.P. 706(D)*. At the June 22, 2017 evidentiary hearing, Appellant testified as did his chiropractor.

Dr. Lupo, Appellant's chiropractor, proffered the opinion that Appellant was "fully disabled." This conclusion was not supportable for at least the following reasons.

Dr. Lupo first saw Appellant as a patient on July 20, 2016, following a two-car automobile accident involving Appellant on June 13, 2016. Prior to this accident, Appellant had back pain from an unspecified back condition. Despite the back pain, Appellant testified he had a steady work history prior to the June 13, 2016 auto accident. Appellant claims to have received a neck injury in the auto accident.

During his first visit with Dr. Lupo on July 20, 2016, Appellant complained of neck, arm and back pain. Based solely on the information provided by Appellant, Dr. Lupo admitted he "did

---

[6] Docket # 712 of 2003; Docket # 24 of 2016; and Docket # 113 of 2016.

7

diagnose him with neck and arm pain the very first day that he walked in." *Evidentiary Hearing, June 22, 2017, p. 20 (hereafter H.T.)*. Dr. Lupo elaborated "My opinion was that he was not able to return to work on July 20, 2016..." *H.T. p.15*. Hence, Dr. Lupo's immediate diagnosis was based on Appellant's subjective complaints of pain. This rushed diagnosis was not the result of any objective medical testing.

This is not a criticism of Dr. Lupo, but a chiropractor relies largely on the self-reported history and responses of the patient. There was only one objective medical test performed on Appellant, which was an MRI exam by a pain specialist, Dr. Joseph Thomas. According to the December, 2016 records from Dr. Thomas, the MRI showed there were compressions in the cervical and lumbar areas of Appellant's spine that could be the cause of Appellant's neck and back pain. This Court accepts Dr. Thomas's interpretation of the MRI as medical evidence of compressions in these two areas of the spine.

However, Appellant's MRI cannot establish when the compressions occurred or what caused them. Appellant has a long history of assaultive behavior, which was not ruled out as the cause of his compressions. If in fact the compressions to his neck existed prior to the June auto accident, Appellant has no basis to claim the accident caused any disability.

Separately, an MRI alone cannot support a finding Appellant was "fully disabled." An MRI can identify a possible source of pain. However, an MRI does not measure, nor is there any objective medical way to measure, the actual level of a person's pain. The only known measurement of pain is the self-report of a patient on a scale of 1 to 5 or 1 to 10. This is an entirely subjective response based on a patient's tolerance of pain and honesty in reporting. Dr. Lupo conceded the subjective nature of measuring Appellant's pain:

> THE COURT: Okay. Now, the symptomatology of what he's experiencing in
> terms of the pain levels -- and you reference it in your April report of the levels of

8

pain, that's a rating that the patient gives to you, typically on a scale of ten, am I correct?

DR. LUPO: That is correct.

THE COURT: And if I'm looking at the first paragraph of your April 12th letter, in large part that is based on information that he's providing to you, correct?"

DR. LUPO: That is correct.

THE COURT: That's not based on any objective medical finding, correct?

DR. LUPO: Correct.

*H T. p. 37.*

The validity of Dr. Lupo's opinion rested largely on the veracity of the information Appellant provided, without any objective medical way to corroborate Appellant's subjective responses. For reasons discussed in detail later, Appellant was not a credible witness. It follows that Appellant was not a credible source for the information he provided to Dr. Lupo. Hence, the resulting diagnosis by Dr. Lupo rests on unreliable ground.

Dr. Lupo's opinion was unpersuasive for several additional reasons. Dr. Lupo was insistent from his first meeting with Appellant on July 20, 2017 that Appellant was "fully disabled" from all forms of employment. Dr. Lupo's rush to judgment was further limited by his conclusion Appellant was unable to return to his job as a meat cutter with Specialty Steaks. However, the inquiry in this case is not whether Appellant can perform a prior job. Instead, the question is whether Appellant has the ability to pay a minimal amount toward the legal obligations arising from his criminal convictions.

Inexplicably, Dr. Lupo did not give any consideration to whether Appellant was capable of performing part-time and/or light duty work:

THE COURT: Okay. Well, let me ask you this because the issue in this case, Dr. Lupo, is not whether he can return to his work as a meat cutter, but the issue is

9

whether he has the ability to make the payment plan that was proffered in this case. At one point it was $75 a month, then it was down to $25 a month. So is it your opinion to a reasonable degree of medical certainty that he's incapable of any form of employment, either as light duty or as a driver of a vehicle of paying the $25 or $75 a month that was in place at the time he filed this petition?

DR. LUPO: I don't really know how to answer that because my job as his doctor is to treat and if you were to bring me a job of "x" and I would have to evaluate each job. You know, what he owes the Court or what he doesn't, I know that this is what this is about, but if you were to bring a job description and say, you know, here's a job description of something that he's going to do at Delta Sonic, and I would look at that and I could tell you from my opinion and what he has going on if he is okay to do that or not.

THE COURT: Well, I'm sure - -

DR. LUPO: I can tell you from the Specialty Meats, he cannot do that currently, you know, and so - -

THE COURT: I understand that point, Doctor, but my question in this, and I'm sure in your field and you've been in this business for a long time in your field, and I respect your opinion here, and I'm sure that you're familiar with the concept of light-duty work, correct?

DR. LUPO: Absolutely.

THE COURT: And light-duty work would address concerns that people have either cervically and/or with their lumbar condition, correct?

DR. LUPO: That is correct.

THE COURT: And so there are light-duty tasks that you can do and employment that wouldn't be cutting meat, but it could be driving a car as you've indicated that you believe that he does.

*H.T. pp. 39- 41*

Dr. Lupo's focus was not on the relevant issue in this case. Dr. Lupo never discussed with Appellant nor considered the possibility of part-time or light-duty work before rendering an opinion that Appellant was "fully disabled". Dr. Lupo conceded, as he must, it is possible that Appellant could perform part-time or light duty work, especially since he still drives an automobile.

10

Dr. Lupo's opinion is also affected by his economic interest in the outcome of Appellant's cases. To his credit, Dr. Lupo has not charged Appellant for a variety of treatments and services. Dr. Lupo hopes to be paid based on a determination that Appellant is disabled and receives money in a personal injury case. *H.T. pp. 29-30.* These circumstances inherently cast a cloud of financial bias over Dr. Lupo's testimony.

Lastly, Appellant's testimony was not credible nor was the information he reported to Dr. Lupo reliable. Appellant has a long history of avoiding payment on his obligations at these 19 different cases dating back to 1991. Notably, he still owes restitution to his victim from a 1991 assault. His payment history does not demonstrate any intent to make his victims whole or to satisfy his legal obligations. The $50 monthly payment ordered herein provides Appellant over 2 future decades, in addition to the 25 years he has had, to pay his legal responsibilities.

Appellant has convictions for crimen falsi, which given the number, diversity, and timing of them, render Appellant's testimony and the subjective responses he gave to Dr. Lupo unbelievable.

Appellant's intent to avoid his legal responsibilities is readily apparent in his failure to even consider, let alone pursue, other forms of employment. When asked by his lawyer whether he had searched for any form of employment since the auto accident on June 13, 2016, Appellant replied:

> "I thought about it, but after, you know, feeling the pain that I was feeling and tingling sensations in my left hand, because I'm left-handed, I'm like, what job is there for me really to do."

*H.T. p.48.*

Appellant was asked the same question by his lawyer on re-direct:

> "A. Unless a miracle happens or unless I have surgery, I don't know if a job is there because I don't know.
>
> Q. Have you made efforts to identify other work?

11

A. Thought about trying to do – I thought about doing some landscaping, but that requires a lot, but that requires a lot."

*H.T., p.64.*

Appellant has not seriously thought about or made any effort to investigate any form of viable employment he could perform, even on a part-time basis, to satisfy his $50 minimum obligation. In addition, he never went to the Office of Vocational Rehabilitation to explore any resources for employment, job training or education. *H.T., p.68.*

Appellant's credibility was also eviscerated by his contradictory testimony. A glaring example was when Appellant testified the first time in 2016 that he failed to meet his minimum payment was after his June 13, 2016 auto accident. *H.T., p.62.* This testimony was clearly false because Appellant failed to make any payments in 2016 prior to his June accident.

As part of this same fabrication, Appellant originally wanted this Court to believe he began working at Specialty Steaks in January, 2016 and worked there continuously until his June, 2016 accident. However, when questioned why he made no payments from January to June, 2016 during a time he was purportedly working full-time at Specialty Steaks, Appellant abruptly changed his testimony:

THE COURT: Okay. And these jobs, were they full-time?

MR. ETTISON: Yes.

THE COURT: So you start in January of 2016 with Specialty Steak?

MR. ETTISON: Correct.

THE COURT: Okay. So according to the records here of your payment summary, up until the time of your accident from January of 2016 to your accident in the middle of June of 2016, there are no payments; why would that be?

MR. ETTISON: I was incarcerated.

12

*H.T., pp. 65-66.*

Q. Okay. You said you were incarcerated?

A. Yes.

Q. Starting in January until June of 2016?

A. No.

Q. Sometime in there?

A. No, I went to jail - - I went to jail December 13th of – December 13th of 2015.

Q. Okay. When did you get out?

A. I got out in 2016, April, I believe, May.

Q. How did you start working at the Steaks place in January if you were incarcerated?

A. I got out - - let's see. I went to jail on the 15th, and I got out - - I started Specialty Steak in January. I can call - -

Q. Well, I'm trying to understand how you're saying you were incarcerated and working?

A. I started Specialty Steaks in January, January 6, 2016, all right. Before that, I was incarcerated in '15, I was - - I went to jail December of '15. I got out in January, I think, because right after I got out of jail, I went to Remedy and got the job.

*H.T., pp. 70-71.*

Q. Let me try and make this simple. You said that you started at Specialty Steaks in January of 2016, correct?

A. Yes.

Q. Your last day working there was June 13th of 2016, the day of your accident?

A. Correct.

Q. Were you incarcerated at any point while you were working for Specialty Steaks?

13

A. I was incarcerated, yes. I was incarcerated for two months from February - -
February and March.

*H.T., pp. 73-74.*

As the record reflects, it was difficult to get a truthful answer from Appellant regarding his alleged employment with Specialty Steaks during a time when he was also in jail.

Likewise, Appellant gave inconsistent explanations for not making any payments from January to June, 2016. As discussed, Appellant first testified he made all of his payments from January to June, 2016 – which was a blatant lie. Appellant's next explanation was that he did not pay while he was in jail (coupled with convoluted answers as to when he was in jail in 2016). Lastly, when asked why he did not make any payments while working with Specialty Steaks from January to June, 2016, Appellant replied: "(t)he only reason why I didn't make payments, they took it up. They took it to $85, and I couldn't afford that, that's the only thing. If they would have left it at $25, I'd still be paying it." *H.T.,p.75.* Appellant's three different versions of his payment history in 2016 were mutually exclusive, meaning if one were true, the other two were false.

Appellant's last statement is most telling. Appellant specifically said he would still be paying $25 monthly if that were ordered. Appellant's admission is contrary to his alleged "full disability" and his claim of an inability to pay any amount.

Another fabrication relates to whether Appellant was ever married. In explaining why he went to jail several times in the first part of 2016, Appellant repeatedly blamed it on his wife. However, in his application for Social Security disability, Appellant specifically represented "I never was married." *H.T.,p.66. See Appellant's Exhibit E.*

In sum, the longer Appellant testified, the more falsehoods he spewed without any conscious regard for the oath he took to testify truthfully. This Court had the opportunity to observe and listen

14

to Appellant throughout the hearing. He was able to stand the entire time without being in any visible pain. He remains able to drive an automobile, which means either he is not "fully disabled" or that he is putting himself and others in harm's way.

Appellant's purported indigence is a fabricated set of circumstances he created. He is not involuntarily destitute.

## CONCLUSION

The distinct impression Appellant formed with this Court is that Appellant wants to avoid his legal responsibilities by capitalizing on his June 13, 2016 car accident. Common parlance would describe Appellant as a malinger. Appellant's testimony was inherently inconsistent, dishonest and unbelievable *en toto*. Unfortunately for Dr. Lupo, he had to base an opinion on input from a deceptive patient.

By his inadvertent admission, Appellant is capable of paying $25 monthly. The order to pay $50 monthly breaks down to $1.67 per day. Appellant did not establish he was incapable of paying $1.67 daily toward the legal obligations incurred from his criminal behavior over nearly 27 years.

BY THE COURT:

Date: _____

_____
WILLIAM R. CUNNINGHAM, JUDGE

cc:    District Attorney's Office
       J. Timothy George, Esquire, 2525 West 26th Street, Suite 200, Erie PA 16506

15